# Richmond

## Anchor Motor Freight, Incorporated, of Delaware v. James R. Paul, Et Al.

November 26, 1956.

Record No. 4579.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*J. Calvitt Clarke, Jr. (Aubrey R. Bowles, Jr.; A. Scott Anderson; Bowles, Anderson & Boyd, on brief), for the plaintiff in error.*

*Harry P. Anderson, Jr. (Richard L. Williams; Leith S. Bremner; Satterfield, Anderson & Blanton; Bremner, Parker, Neal, Harris & Williams, on brief), for the defendants in error.*

BUCHANAN, J., delivered the opinion of the court.

James R. Paul, plaintiff below, sued the defendants, Anchor Motor Freight, Incorporated, herein sometimes referred to as Anchor, and Southern Motor Express, Incorporated, herein sometimes referred to as Southern, for personal injuries and property damage resulting from a collision involving a dump truck owned and operated by the plaintiff, and two trucks owned and operated respectively by the defendants. He recovered a verdict against both defendants. The trial court entered judgment thereon against Anchor but set the verdict aside as to Southern and entered judgment in its favor. Anchor appeals on the grounds that the court erred in the admission of testimony; that the verdict was contrary to the evidence, but if proper against Anchor it should not have been set aside as to Southern. Southern assigns cross-error and contends that no actionable negligence was shown as to it, and that plaintiff was guilty of contributory negligence. The plaintiff assigns cross-error to releasing Southern.

The accident occurred around noon on December 2, 1952, on U. S. Route No. 360 not far west of Richmond. Route 360 at that point is a straight, four-lane highway running east and west, divided in the middle by a four-foot grass plot bordered by a concrete curb. The two eastbound lanes are each 12½ feet wide. In the area of the acci-

dent Hey Road enters 360 from the south in a slightly northeastern direction, fans out as it enters 360, and near the middle of it is a large stop sign within a small grass plot enclosed by a concrete curbing, the north edge of which is about thirteen feet south of Route 360. For 1,000 feet west of Hey Road No. 360 is downgrade, dropping 30 feet in that distance. A large map on a scale of 1 inch equals 5 feet, made by an engineer, was introduced by the plaintiff and photographs were introduced by the defendants showing the physical features in the area involved. There was an intersection warning sign on the south side of No. 360 about 475 feet west of the intersection.

The Anchor truck was an automobile carrier of the tractor-trailer type, 45 feet long and running empty that day. The Southern truck was also of the tractor-trailer type, about 45 feet long, and fully loaded with textile goods.

The only eye-witnesses to the accident were the plaintiff and the drivers of the other two trucks. Plaintiff's testimony as to what happened was to this effect:

The plaintiff, who is a building contractor, was driving his dump truck northwardly on Hey Road expecting to turn right on No. 360 and go to Richmond. It was raining lightly, snow flakes were falling and the road was wet. When he got to the stop sign he stopped, looked to his left, *i.e.*, to the west, and saw these two trucks around 800 to 850 feet away coming over the crest of the hill side by side. Thinking he had plenty of time he moved forward, changing from low gear into second and then into high, and started on down No. 360 in his right-hand lane. When he got to a place on 360 which he pointed out on the map, he heard a crash behind him. Looking into the large mirror on the side of his truck, which afforded him a clear view, he saw the Southern truck in the same lane he was in and Anchor pulling away to the left from a sideswipe with it. On veering away, Anchor's left front wheel struck the curb of the middle grass plot, after which the truck came on down the road with its back end "sunfishing".

As the Anchor truck overtook and was in the act of passing plaintiff, who was then going from 25 to 30 miles an hour, the rear end of the trailer swung over and its right rear end struck the left front of plaintiff's truck, after which Anchor continued on down the road still "sunfishing" and stopped 78 feet beyond the crossways of the grass plot. Plaintiff said the Anchor truck afterwards showed a

mark about six inches from the end of the trailer where it had scraped green paint off the plaintiff's truck.

This blow turned plaintiff's truck to the right and he was thrown to the left against the side of his cab. He immediately applied his brakes and in a very short time, he would say about two seconds, the Southern truck hit his truck from behind. When he stopped, the rear end of his truck was even with a pole designated as No. 18 on the map, and which was 156½ feet in a straight line east of the stop sign. The right front wheel was about two feet off the pavement. Southern's right front fender and bumper were wedged under the body of the dump truck so that the left rear of the dump truck was sitting up on the bumper of the right-hand side of Southern and it was necessary to get a wrecker to lift it off.

A witness who repaired plaintiff's truck testified that a left front fender, left headlight, front bumper and gravel deflector were put on; and the bill for the repairs included a charge for checking the rear end alignment.

The evidence for the defendants was to the effect that the plaintiff drove out of the intersection without stopping, struck the Southern truck near its right front and forced it into collision with the Anchor truck as the latter was passing Southern at the intersection.

The driver of the Southern truck was called as a witness by the plaintiff and testified that he was running about 30 to 35 miles an hour down the hill and first saw plaintiff's truck when he was 400 to 500 feet back west of Hey Road. The plaintiff, he said, never did get into his lane of travel but came out into the side of Southern and knocked it against Anchor, which "sideswiped along beside of me and continued on up the road and wound up across the grass plot." When plaintiff's truck stopped it was still on the shoulder of the road with Southern's right front tire in front of plaintiff's back wheel. Testifying later as Southern's witness, he said: "The front end of my tractor was wedged in with his front end and he was more or less wedged into the side all the way up." The collision, he stated, was right at the intersection and the plaintiff came out of the intersection without stopping and ran into the front of his truck as Anchor was passing him.

The driver of the Anchor truck was examined by the plaintiff as an adverse witness and testified that he did not see the intersection because he was trying to pass the Southern truck, and he did not see the plaintiff's truck until it came out into the right front of Southern

at the intersection when he was trying to pass Southern; that plaintiff's truck forced Southern over into the Anchor truck and caused it to cross the curb onto the grass plot, after which he came to rest within about 30 feet. He later said he stopped 75 to 80 feet from where he came in contact with Southern. Testifying as Anchor's witness he said he approached the intersection at about 35 miles an hour and that no part of his truck ever came in contact with plaintiff's truck.

An automobile mechanic testified that he was called to the scene and found the right front of Southern tied into the left front of the dump truck and they were locked together and had to be moved by a wrecker; that the dump truck was then sitting with two wheels off the hard surface to the right.

Anchor took the deposition of a former county police officer, then in Florida. He testified that he happened along soon after the accident and made an investigation. At that time the Anchor truck had been moved to the right-hand side of the road. All of the vehicles were east of the intersection, with the dump truck off the shoulder of the road and the Southern tractor partly on and partly off with the rear of the trailer completely on the road. The rear of the trailer was 50 steps east of the stop sign. The left front fender of the dump truck was damaged back to the rear wheels. Southern was damaged on the right front fender and on its left side there were scrape marks where the paint had been chipped off and a mark where another metal object had rubbed against it. Anchor was damaged on the right front fender and a continuous scrape mark extended from the front to the rear on the right side.

He talked to all three of the drivers together. Plaintiff told him that he had come out of Hey Road and started east on 360 when he was struck from behind on the left of his truck. Plaintiff did not then say that Anchor's truck hit his truck with its rear end. Neither of the drivers of the other two trucks stated that the plaintiff did not stop at the stop sign so far as he could recall. Anchor's driver did not tell him that there was a collision between the plaintiff's truck and the Southern truck prior to Anchor's collision with Southern, but said that Southern moved over and narrowed his room for passing and forced him over onto the island. Southern's driver told him plaintiff's truck approached him to his right coming out of Hey Road onto 360 and "that he struck on the right front of his truck." None

of the drivers pointed out where the actual impact took place and he said it was impossible to tell from the physical evidence.

While he testified that Southern was to the left side of the dump truck and parallel to it after they had stopped, he made a diagram during his testimony and placed the right front of the Southern tractor in contact with the left rear of the dump truck opposite pole No. 18 above referred to, and in that connection testified that the right front of Southern was wedged between the top of the rear tire and the bottom of the body of the dump truck.

It clearly appears that the evidence on practically all material points was in sharp conflict. If the accident happened as the plaintiff said it did, then it was for the jury to decide whether the collision was caused in whole or in part by the plaintiff's negligence. Cf. *Vaughan* v. *Eatoon*, 197 Va. 459, 89 S. E. 2d 914. If, as the defendants claim, the plaintiff drove out of the intersection without stopping and into the side of the Southern truck, causing it to collide with Anchor, then he was not entitled to recover.

It is not our task, of course, to weigh the evidence and find for the party in whose favor we think it preponderates. This was peculiarly the function of the jury, who saw all save one of the witnesses and from their vantage point divided the true from the false. *Forbes & Co.* v. *Southern Cotton Oil Co.*, 130 Va. 245, 108 S. E. 15; *Crist* v. *Coach Company*, 196 Va. 642, 85 S. E. 2d 213.

■ The court correctly and without objection instructed the jury that if the plaintiff stopped in obedience to the stop sign, saw the Anchor and Southern trucks approaching from the west at a distance which would warrant a prudent man in the exercise of reasonable care to conclude that it was safe to proceed on Route 360, then the plaintiff had a right so to proceed. See *Temple* v. *Ellington*, 177 Va. 134, 12 S. E. 2d 826; *Tellis* v. *Traynham*, 195 Va. 447, 78 S. E. 2d 581. The jury's finding for the plaintiff under this instruction is not to be disturbed if supported by credible evidence. *Atlantic Greyhound Corp.* v. *Shelton*, 184 Va. 684, 36 S. E. 2d 625; *Schools* v. *Walker*, 187 Va. 619, 47 S. E. 2d 418.

It was clearly testified by the plaintiff that the accident happened that way, and his testimony found some corroboration in the evidence of the police officer.

[■ Southern concedes in its brief that a direct conflict developed between plaintiff's evidence and the evidence of Anchor and Southern as to how the accident occurred which was resolved by the jury in

plaintiff's favor. Anchor, however, contends that plaintiff's testimony was incredible and impossible to believe. To support that charge it makes certain mathematical calculations to demonstrate that the defendants' vehicles would have had to be going 7½ times as fast as the plaintiff's to have caught up with and struck the plaintiff as he described; further, that not more than 2¼ seconds elapsed from the time plaintiff said he saw Anchor and Southern collide and the time plaintiff's truck came to rest, and that in that time Anchor could not have made the movements plaintiff said it did. These calculations, however, are based on elements of place, speed and distance not conclusively established by the evidence. They may well have been for the jury to consider, but they do not as a matter of law render the plaintiff's testimony incredible.

In *Burke* v. *Scott*, 192 Va. 16, 23, 63 S. E. 2d 740, 744, we said: "To be incredible, evidence must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ." See also *Clayton* v. *Taylor*, 193 Va. 555, 560, 69 S. E. 2d 424, 428.

Anchor's remaining assignments are to the use of models to illustrate positions of the vehicles, and to plaintiff's counsel asking him a leading question.

■ Anchor contends that the use of these models gave the jury an inaccurate visual picture of the happening of the accident because they were not of the same dimensional scale as the map on which they were used, and also slipped around on it so as to interfere with its counsel's cross-examination. Such objection as was made to the models occurred during the examination of the plaintiff's engineer as to the map and he did not attempt to use them. They were thereafter used by both sides without further objection in examining the plaintiff and other witnesses. The objection did not fairly meet the requirements of Rule 1:8 and plaintiff asserts that the point was not raised on the motion to set aside the verdict. In any event the record does not indicate that the defendants were prejudiced by this procedure or that their counsel suffered any handicap that could not readily have been removed by simply making marks on the map to show the places and distances testified about. Such matters are within the sound discretion of the trial court and this record shows no abuse of that discretion. See 32 C.J.S., Evidence, § 603, p. 455; Anno., 9 A. L. R. 2d 1044.

When plaintiff was cross-examined he said that he stopped in approximately 3 feet and it could be inferred from the context that he meant from where he was struck by Anchor. He had testified also that after being struck by Anchor he was hit by Southern. On redirect examination his counsel asked him: "Was it after you were hit the second time from the rear that you traveled the three or four feet that you have referred to?" Anchor assigns error to this question as being leading. Obviously it was leading and should have been differently phrased, but just as obviously it was not error for which this case should be reversed. 20 Mich. Jur., Witnesses, § 33, p. 468.

We hold that the court ruled correctly in refusing to set aside the verdict as to Anchor and the judgment against Anchor is affirmed.

The court set aside the verdict as to Southern on the ground that the evidence did not show any negligence on the part of its driver. Anchor and plaintiff argue in their briefs that this was error. Southern contends that the plaintiff's testimony absolved Southern of negligence as a matter of law and relies on the doctrine of *Massie* v. *Firmstone*, 134 Va. 450, 114 S. E. 652, as explained and limited in *Crew* v. *Nelson*, 188 Va. 108, 49 S. E. 2d 326, and *Clayton* v. *Taylor*, *supra*, 193 Va. 555, 69 S. E. 2d 424. The evidence of the plaintiff when considered as a whole does not, we think, show clearly and unequivocally as a matter of law that he had no case against Southern.

Southern points to the testimony of the plaintiff that when he heard the crash and looked back Southern was directly behind him on its side of the road; that after the Anchor truck struck his front end he immediately slammed on his brakes and in "about two seconds, a very short distance, a very short time," he was struck by Southern coming on behind him; that the physical damage to his dump truck was done by Anchor and that if Anchor had not struck the left front end of his truck there would have been no accident; that Southern did no damage to his truck at all, and that at no time did he see Southern out of its proper lane. Southern contends that this testimony, coupled with the lack of any showing of excessive speed, negatived any negligence on the part of Southern.

On the motion of the plaintiff, and without objection from either defendant, the court instructed the jury that it was the duty of each defendant to operate its tractor trailer at a prudent speed not greater than was reasonable under the conditions then existing; to keep a proper lookout and take reasonably prudent action to avoid any danger thereby disclosed; to keep its tractor trailer under proper control

and to use its brakes when necessary in the exercise of ordinary care to avoid a collision.

The jury by its verdict accepted as true the plaintiff's version of the accident; *i.e.*, that when he drove out into 360 the trucks coming down the hill abreast in plain view were far enough away that it was reasonably safe for him to proceed, and that he had proceeded down his right-hand lane of 360 more than 100 feet before he was struck from behind by the Southern truck.

Section 46-227 of the Code requires that the driver of a vehicle about to be overtaken and passed by another shall give way to the right in favor of the overtaking vehicle on proper signal being given, while § 46-229 requires that the driver of a vehicle shall not follow another more closely than is reasonable and prudent, considering speed, traffic and conditions of the highway.

The plaintiff drove out of the intersection in plain view of the driver of the Southern truck, who knew the intersection was there and had seen plaintiff approaching it. The Southern truck was fully loaded and these two tractor trailers, each 45 feet long, were running abreast downhill, one trying to pass the other and together taking all the road. The road was wet and rain mixed with snow was falling. Anchor collided with Southern and continued on with its back end "sunfishing" to overtake and pass plaintiff's truck, which was then going 25 to 30 miles an hour. Despite these elements of possible disaster Southern drove on with undiminished speed so far as the record shows, and was within 30 to 50 feet of the plaintiff's truck before the latter was struck by Anchor.

It is true that there was no evidence of excessive speed on the part of the defendants in the sense of exceeding the maximum speed limit at that point, but that was not necessarily the measure of their duty, as the court instructed the jury. It was the duty of both to operate at a careful and prudent rate of speed under the existing conditions; it was also the duty of Southern to have this large and fully loaded vehicle under proper control and to take reasonably prudent action to avoid any danger which a proper lookout would disclose.

While the plaintiff said his truck was not damaged when struck by Southern, he also testified that he was thrown forward by that impact and he could not tell which one of these impacts caused which one of his injuries.

Under the conditions and circumstances shown by the evidence, as the jury had a right to view it and as they obviously did view it,

Southern did not perform its duties as defined by the court and the verdict of the jury against it should not have been set aside. The judgment in favor of Southern is therefore reversed, the verdict of the jury against it is reinstated and final judgment here entered thereon in favor of the plaintiff.

*Affirmed in part, reversed in part and final judgment.*