# Richmond

GETTYS R. THOMPSON v. EVELYN K. LETOURNEAU.

December 2, 1957.

Record No. 4714.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Whittle and Snead, JJ.

The opinion states the case.

*J. Sloan Kuykendall* and *Thomas V. Monahan* (*Henry H. Whiting*, on brief), for the plaintiff in error.

*Joshua L. Robinson*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This action was instituted by Mrs. Evelyn K. Letourneau, hereinafter referred to as plaintiff, against Gettys R. Thompson, referred to as defendant, to recover damages for injuries which she incurred while riding as a guest-passenger in an automobile operated by the defendant. The defendant filed grounds of defense denying all negligence on his part and a plea of contributory negligence. At the conclusion of the plaintiff's evidence, defendant moved the trial court to strike it on the ground that it failed to establish gross negligence on the part of the defendant. The court overruled the motion.

The jury returned a verdict in the following language: "We, the jury, find the defendant guilty of gross negligence in the way he operated the car and award the plaintiff, Evelyn K. Letourneau, the sum of $7,500 damage sustained in the accident." The court overruled a motion of the defendant to set aside the verdict as contrary to the law and the evidence, and entered judgment according to the verdict.

On this writ of error granted the defendant, we are asked to reverse the judgment as not supported by the evidence and for the refusal of the trial court to instruct the jury on the issue of contributory negligence and to grant Instructions 9 and 10 tendered by the defendant.

In support of the first ground, the defendant argues that the testimony of the plaintiff is incredible. However, he admits in his brief that, "If it can be believed, it is sufficient not only to establish gross negligence on the part of the appellant, but would prove him guilty of callous, willful, and wanton disregard of" her rights. In view of the verdict of the jury, the sufficiency of the evidence should, under established principles, be stated in the light most favorable to the plaintiff. However, in order to understand more clearly defendant's contentions with regard to the instructions requested by him, the evidence will be set out somewhat more in detail. It may be summarized as follows:

The automobile accident under review occurred on October 28, 1955, between 6:00 p. m. and 6:45 p. m., when it was not fully dark, but necessary to drive a car with its headlights burning. It

happened at a point on Highway Route 340, approximately three miles north of the Town of Grottoes, where the highway crosses a ravine on a bridge with cement sides. Route 340 is a two-lane highway running north and south at the point of the accident. Immediately to the south of the above mentioned bridge, a dirt road leads from the east side of the highway to the home of Melvin Morris and his father, Roy Morris. North of the bridge the road is straight for about one-half mile to its intersection with a road leading to Lynwood Mill, which is west of the highway. While the road is straight for one-half mile, there is a "dip" in it about two hundred and fifty or three hundred yards north of the bridge. However, the top of an automobile at the bottom of the "dip" is visible to approaching drivers.

The plaintiff, a married woman twenty-one years of age, is separated from her husband. She spent a portion of October 28, working at her mother's home a short distance east of Route 340. Accompanied by her six-year old niece, Doris Jean Smith, she left there between five and five-thirty p. m., to walk to her sister's home, one and one-half to two miles further to the east of Route 340. While walking along the road, about one-half mile from her sister's home, she met the defendant in his car driving in the opposite direction. He stopped, told her that he had left his son, Tommy, and her two brothers at the home of her sister, where plaintiff lived, and invited her to get into his car, saying that he would turn around at Merica's Store, near a cross-roads further on, and then drive her home, since he was going there to get his son. Plaintiff said that she was tired from her work that day, so she accepted his invitation, got into the car, put her niece in the center of the front seat, and sat on the end of that seat. She had known Thompson for four or five years, and he had lived within "hollering" distance of her mother's home. She noticed nothing unusual about his appearance when he invited her to enter his car.

Thompson drove towards Merica's Store; but when he got there he turned left at the intersection of Route 603, and continued onward instead of turning around as he promised. She immediately told him that she wanted to get out of the car, and that she and her niece would walk home, as she had told her sister that she would be home before dark, and look after the children, so that the latter could go to a movie at a drive-in theater. He replied that she could "just stay in the car" until he went to Grottoes, a town twenty miles

or more distant on Route 340, where he could get some beer. She told him that she did not drink beer and did not want any; but he paid no attention to her request. She twice repeated her request to be let out of the car before they reached Route 340, and he ignored each of them. When he arrived at Route 340, he stopped, and she told him that she and the child would get out and walk home. He replied, "My God, you can stay in the car until I go to Grottoes and back." She did not try to get out of the car because her niece was in it, and she thought about the safety of the child. Defendant made a left-hand turn at the intersection with Route 340, and proceeded towards Elkton, four miles distant. She told him he could get beer at the intersection, but he did not stop there. He went on past Merck & Company's plant, three miles further on and she did not try to get out because she was thinking of the safety of herself and the child, and thought it would do no good to keep on making requests to be allowed to alight. He did not stop at any place long enough for her to get out safely.

Plaintiff said that when the defendant first refused her request to get out, she "figured" there was something wrong with him. She looked and saw his eyes were bloodshot, his face was red, and she smelled alcohol on his breath. Between Elkton and the Merck plant, he drove "around sixty or sixty-five on the straight stretch." She told him that she didn't like to ride fast; but he paid no attention to her. He continued to drive most of the distance to Grottoes at sixty or sixty-five miles per hour. When he reached another "straight stretch" of the road, he drove at a speed around seventy miles an hour, and while driving at that speed, and when he was "about two blocks" from the bridge where the accident occurred, which she estimated to be three hundred feet, she saw ahead on the road a car with its tail lights burning, which "looked like it was stopped to make a turn." She yelled "Mr. Thompson, it is a car stopped up there in the road." He did not answer and kept on driving; so she said, "Watch that car up there." He ignored her and drove on at the same speed. She then put her niece on the floor of the car, yelling again, "Oh! you are going to hit that car up there in front of us." Without slowing down, he continued at high speed, and ran into the rear of the automobile ahead which was being operated by Melvin Morris. She was thrown into the windshield, and suffered serious physical injuries. Thompson gave her $3.00 and told her to go to see a doctor.

On cross-examination, she said that Thompson had taken her home on one other occasion when he had his young son with him; that she trusted him and he had never given her any cause to believe he would mistreat her; and that she had no fear of him when she accepted the invitation to enter his car on October 28.

Mrs. Ruth Ann Smith, sister of the plaintiff, said the defendant came to her home about five-thirty p. m. on the day in question, inquired as to the whereabouts of her husband and the plaintiff. She told him that the plaintiff had gone to the home of her mother; but had promised to return before dark, so that she could go to a moving picture show. She said that the appearance and actions of the defendant indicated that he had been drinking. She added also that the son of the defendant had not been at her home that day.

Melvin Morris had gone in his car to Lynwood Mill to carry his father home. Lynwood Mill is located on a road leading off the western side of Route 340, the intersection being about one mile north of the private road on the east side leading to the home of Melvin Morris. Melvin Morris testified that upon returning with his father to Route 340, he turned to the right, and proceeded on Route 340 about forty or forty-five miles per hour. As he approached the bridge near where he intended to make a left-hand turn into the road leading to his home, he saw approaching him two automobiles estimated at a couple of lengths apart. Their headlights were burning, but not enough to cause him to be "blinded too much." Looking in his rear view mirror, he saw a car following him "around a hundred yards or something like that," and he "figured maybe he was going about the same distance (*sic*) or maybe a little faster" than the witness. When he arrived at a mailbox estimated to be distant about one hundred yards from the intersection, he held out his hand for a left-hand turn and slowly brought his car to a stop, with its rear wheels on the bridge. After the two approaching cars had passed him, and still holding out his hand for the left turn, he put his car in low gear and, with his foot on the clutch, was preparing to start off when his car was struck in the rear by defendant's car.

The Morris car was knocked over the side of the embankment of the road into a tree on its right-hand side. The defendant's car was about a foot off the hard surface, about half way to a ditch. Thompson got out of his car and said only these words: "I guess they will put it on me." Both cars were greatly damaged according to the

evidence and the picture exhibits. There were skid marks on the road behind defendant's car twenty-four to thirty inches long; but the witnesses said there was nothing to show that they were connected with the operation of that car.

Roy Morris said he saw his son hold out his hand, giving a signal for a turn. The two northbound cars passed them, and then their car was struck by defendant's car.

Claude E. Raynes and his father Floyd J. Raynes, left Lynwood Mill a few minutes after the Morris car. When their car reached Route 340, they stopped and waited for defendant's car to pass. They then turned to the right on Route 340, behind defendant's car, and drove at a speed of about fifty-five miles per hour. Claude E. Raynes, the driver, said that he usually drove "as close to the speed limit as I can get." The Raynes were first to arrive at the scene of the accident after the collision, being flagged down by Melvin and Roy Morris, who had gotten out of their damaged car and were standing on the roadway.

Trooper C. P. Bucher, who investigated the collision, estimated that the mailbox, mentioned by Melvin Morris, was approximately one hundred and fifty feet distant from the bridge where the collision occurred. Neither Melvin Morris, Roy Morris, Claude E. Raynes, nor Trooper Bucher observed anything about defendant or his actions to indicate he had been drinking.

A State Trooper, Raleigh Crist, off duty at the time of the accident, passed the scene of the collision a few minutes thereafter. He talked to the defendant, who did not say anything to him about being blinded by the lights of an oncoming car, or complain about the absence of tail lights on the Morris car; but he did say that he did not want an investigation of the accident because the parties would settle the matter among themselves.

Gettys R. Thompson, the defendant, is a widower, fifty-five years of age. He is a telegrapher, employed on a shift from midnight to eight a. m. He has an adopted son, Tommy, fourteen years old, who lives with him. He said that he had taken one drink of whiskey about two p. m., before dinner; that he fed his son, who returned from school about four-thirty p. m.; and then decided to go to see plaintiff to find out if she was interested in doing some work for him. After going to Mrs. Smith's home, he met plaintiff on the road, asked her if she wanted to ride around a while, and she replied that she had the little girl with her. When she hesitated, he

replied: "I am not trying to pull anything." He said that after she got in the car, it was decided to get some beer; but plaintiff having expressed a dislike for Rockingham beer, he suggested going to Grottoes. She told him that she did not want to stay out too late, as a man from Washington was coming to see her, and she wished to be home when he arrived. He said they talked about plaintiff going to work for him, and she never asked to be allowed to get out of the car, or return home; and that she did not complain about the speed he was driving at any time. He declared that on the straight stretch by the Merck plant, he increased his speed to about fifty-five miles per hour, and when they arrived at the road leading from Lynwood Mill, he saw a vehicle two hundred to three hundred feet ahead, with dim tail lights, traveling about forty miles per hour, the same speed he was traveling. When he got about three hundred or four hundred feet north of the bridge, he saw two vehicles traveling in the opposite direction, their lights interfered with his vision, he cut down on the gas and "went to looking right directly in front of the car at the road where I could tell where I was at in the road." He saw no arm signal from the car ahead of him, although it could have been given. As he was entering the bridge, at about thirty miles per hour, the last of the oncoming vehicles passed him. He was then too close to the Morris' car to prevent the collision.

The principal question presented by the defendant is whether the testimony of the plaintiff is incredible. He says that her evidence as to the intoxication of the defendant and as to her requests to be allowed to get out of the car were attempts to influence the jury improperly, and that the rate of speed she attributed to him immediately before the collision is contrary to the evidence and the physical facts, both as to the time and the distance involved.

In several recent cases, we have discussed at length the test to be applied in determining the credibility of witnesses and the weight to be given their testimony.

In *Daniels* v. *Transfer Co.*, 196 Va. 537, 544, 84 S. E. 2d 528, we approved the following statement from *Burke* v. *Scott*, 192 Va. 16, 23, 63 S. E. 2d 740:

"To be incredible, evidence must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ."

See also *Anchor Motor Freight* v. *Paul*, 198 Va. 480, 486, 95 S. E. 2d 179.

In *Clayton* v. *Taylor*, 193 Va. 555, 561, 69 S. E. 2d 424, we said: "* * * (F)or a litigant to be barred from recovery because his testimony is irreconcilable or at variance with physical facts or other certain proof, it must have been unequivocal and upon matter within his knowledge and so conclusively in conflict with other proven facts as to leave no reason for difference of opinion between reasonable men."

In *Bradley* v. *Commonwealth*, 196 Va. 1126, 1136, 86 S. E. 2d 828, we said:

"In testing the credibility and weight to be ascribed to the evidence, we must give trial courts and juries the wide discretion to which a living record, as distinguished from a printed record, logically entitles them. The living record contains many guideposts to the truth which are not in the printed record; not having seen them ourselves, we should give great weight to the conclusions of those who have seen and heard them."

In the case of *Simpson* v. *Commonwealth*, 199 Va. 549, 100 S. E. 2d 701, this day decided, we reviewed the cases on this subject, and reaffirmed our former holdings.

In the excitement and stress which arise under circumstances similar to those in this case, it is not unusual for a witness to fail to be completely accurate in his measurement of time and distance. Often a witness can only give a best estimate of such incidents. Here, the testimony of the plaintiff finds some support in inferences which may be reasonably drawn from the evidence of the defendant and other witnesses, and from the damages inflicted on the cars involved in the collision. The evidence, as a whole, presented a factual situation for the determination of the jury, in view of all the surrounding circumstances. They had the opportunity to observe the attitude and demeanor of each of the witnesses, and they had the right to evaluate the significance of the physical facts and the exhibits presented in evidence. They have accepted the evidence of the plaintiff, and we cannot say that it is manifestly untrue, unworthy of belief, contrary to physical facts, and inherently incredible. There is nothing physically impossible about the speed ascribed to the defendant, his failure to observe the stopped car ahead of him, or his disregard of the protests which the plaintiff claimed she made.

Defendant was charged with the duty of keeping a lookout. He was in as good a position as the plaintiff to observe the Morris car. He did not claim that he was suddenly or completely blinded as he neared a point where the collision occurred. He admitted that he knew Morris' car was ahead; that he saw its tail lights; and that he drove, with the lights of the oncoming car interfering with his vision, looking only at the road directly in front of his car. The undisputed fact that plaintiff placed the child passenger on the car floor should have given him some indication of the dangers feared by the plaintiff. The circumstances, as a whole, and the warnings given him, required him to increase his diligence to a higher degree of care to avoid injury to any one on the road or in his car, and the presence or absence of proper care was a jury question. *Howe* v. *Jones*, 162 Va. 442, 446, 174 S. E. 764.

The verdict of the jury in itself expresses vividly their conclusion. It was their province to pass upon conflicting and inconsistent statements and what part of the evidence they should credit, and their conclusion is entitled to great weight. Here, their conclusion is supported by the approval of the trial judge, and we cannot invade the province of the jury and say that their verdict was not justified. *Kirby* v. *Moehlman*, 182 Va. 876, 883, 30 S. E. 2d 548; *Clayton* v. *Taylor, supra;* 20 M. J., Witnesses, § 74, pp. 535-537.

■ There was no evidence upon which to base an instruction on contributory negligence. Defendant presented no evidence as to any negligence on the part of the plaintiff. If the accident happened as he said it did, there was no act of the plaintiff which helped, aided, or contributed to the collision. If it happened as the plaintiff said it did, she was guilty of no negligence. *Garst* v. *Obenchain,* 196 Va. 664, 672, 85 S. E. 2d 207; *Newell* v. *Riggins,* 197 Va. 490, 493, 90 S. E. 2d 150.

Requested Instruction No. 9 is a finding instruction. It is based upon a part of the evidence and fails to include pertinent factors relating to the collision. It ignores the fact that defendant admitted knowledge of the Morris car traveling along the highway in front of him, and it assumes the contrary of the undisputed fact that Morris did give a signal of his intention to turn off the road. Defendant properly concedes in his brief that the instruction is inapplicable, in the event we hold that the testimony of the plaintiff is not incredible.

Requested Instruction No. 10 is based principally upon the as-

sumption that Morris stopped his car without giving a signal clearly visible to the defendant, and upon the right of the defendant to "assume" that Morris would not stop his car in the highway without giving such signal. This instruction fails to include other pertinent evidence. There is no issue of fact as to whether Morris did give a signal of his intention to turn. Defendant refused to deny that the signal was given, and said, "* * * he could have *give* a signal; I didn't see it." Instructions Nos. 9 and 10 each ignore the evidence relating to defendant's gross negligence.

The trial court took the view that there was only one real issue in the case, that is, whether the defendant was guilty of gross negligence. We agree with that view. The jury were correctly instructed on that issue. The instructions were fair to the defendant, and no harm or prejudice was done to him in the denial of any instruction. The law and the evidence support the verdict of the jury, and the judgment complained of is affirmed.

*Affirmed.*