COURT OF APPEALS OF VIRGINIA

Present:   Judges Benton, Frank and Felton
Argued at Chesapeake, Virginia


BOBBY S. HAWKINS

                                                            MEMORANDUM OPINION* BY
v.        Record No. 0932-04-1                       JUDGE ROBERT P. FRANK
                                                                 MARCH 15, 2005

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Edward L. Hubbard, Judge

Charles E. Haden for appellant.

Robert H. Anderson, III, Senior Assistant Attorney General
(Jerry W. Kilgore, Attorney General, on brief), for appellee.


Bobby S. Hawkins, appellant, was convicted by a jury of two counts of aggravated sexual

battery, in violation of Code § 18.2-67.3.  On appeal, he contends the evidence was insufficient to

convict, i.e. that the testimony of the two young victims is inherently incredible.  Finding no error,

we affirm the convictions.

BACKGROUND

"On appeal, 'we review the evidence in the light most favorable to the Commonwealth,

granting to it all reasonable inferences fairly deducible therefrom.'" Archer v. Commonwealth, 26

Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (citation omitted).

So viewed, the evidence proved appellant taught at an elementary school where his

stepdaughter, M.L., attended.  In late June 2002, M.L. had three school girlfriends spend the night at

_____

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

appellant's apartment. The girls, C.H., age 9, her sister, A.H., age 8, and K.A., age 10, played in M.L.'s room, creating a great deal of noise.

Late at night, appellant asked the girls to come into his bedroom. There, appellant who "had on some boxers and a T-shirt," was watching the Cosby show on TV and drinking beer. C.H. had seen appellant drinking beers earlier that evening. After the four girls went into appellant's bedroom, the door was then closed. M.L.'s mother and a second female family member were the only other adults in the apartment, but they were not in the bedroom.

C.H. testified at trial that she saw appellant touch K.A.'s breast on top of her clothes and her vagina "inside" her clothes. Appellant's eyes were "halfway open and closed." C.H. further testified appellant touched M.L. on the breasts, although M.L. denied any improper touching when she testified. C.H. said appellant also touched her breasts under her clothes and her vagina on top of her clothes. During the incident, neither appellant nor any of the young girls said anything. C.H. remained silent because she "was so afraid [that] I might get in trouble."

A.H. testified she saw appellant touch K.A.'s vagina and breast, but did not see any touching of C.H. or M.L. because she went to sleep.

K.A. testified appellant touched her breast and vagina under her clothing. She testified appellant also touched C.H. on her breast only and touched A.H.

Initially, M.L. was interviewed by the Commonwealth's Attorney and indicated she saw appellant "touch two of the girls." Then, M.L.'s mother "became very irate" and privately conferred with M.L. M.L. returned to the Commonwealth Attorney's office and recanted, stating that she might have "gotten confused in that he may have, or the girls may have, made him touch them."

At trial, M.L. testified that while the girls were in appellant's bedroom, C.H. "moved me out of the way and went to go lay beside him and put [appellant's] hand in her private parts." Appellant

was sleeping. Then, K.A. supposedly moved next to appellant on the bed and likewise "put his hand on her private part." Appellant testified he believed M.L. had truthfully testified.

The girls returned to M.L.'s bedroom to go back to sleep. In the morning C.H. and A.H. returned home. C.H. "was still afraid." They did not speak with anyone else about the incident before their family moved to New Jersey shortly thereafter.

Testifying in his own behalf, appellant denied having inappropriately touched any of the girls. He testified that his wife and her daughter were the other adults in the apartment. He stated that he had asked the girls to quiet down on several occasions, but they continued to be noisy. He then asked them to come into his bedroom "and watch T.V. in there just to keep it quiet." Once the girls came in, appellant, who was wearing a "T-shirt and pair of shorts," "[g]ot under the covers and laid there and watched T.V. for a minute and went to sleep." Appellant testified that he remembered nothing thereafter until his wife told the girls to go to the other bedroom at about 3:00 a.m. He acknowledged he had been drinking brandy throughout the evening.

During the trial, appellant introduced transcripts of the preliminary hearing, which contained inconsistencies in the girls' testimony. At various times, depending on which attorney asked the question, C.H. said that appellant was "dead asleep," "halfway asleep," and "eyes open" during the sexual assaults. Nevertheless, C.H. testified appellant touched her chest and vagina and that he touched K.A.'s chest and "private parts."

A.H. testified, at the preliminary hearing, that she saw appellant touch K.A.'s breast and vagina. On cross-examination, in response to defense counsel's question:

> So you didn't really see anything that happened with the girls, did you, other than what you've been told by other people? You didn't really see anything, did you --

A.H. responded, "no." Yet, on re-direct, she confirmed she saw appellant touch K.A.

None of the young girls related this incident to anyone until September of 2002 when K.A. told a schoolmate about the sexual assault. K.A.'s friend then reported the incident to a teacher, who, in turn, informed the school principal, Sheila Hill. Ultimately, Ms. Hill interviewed K.A. who gave conflicting stories. She initially told the principal appellant had "been feeling her on her breasts." K.A. also told her that appellant was wearing no pajama bottoms. She then told the principal that while appellant slept, C.H. placed appellant's hand on C.H.'s vagina. C.H. then took appellant's hand and rubbed K.A.'s vagina. C.H. also told the principal that appellant "got on top of her and was moving up and down." He did the same to the other three girls.

School personnel contacted the Newport News Police Department. Discovering that C.H. and A.H. had moved to New Jersey, Newport News police contacted the New Jersey police who interviewed C.H. A transcript of that interview was introduced at trial.

C.H. told the New Jersey detective appellant touched her breast and thigh. She also saw appellant touch K.A.'s "private part" under her clothes. K.A. specifically denied that appellant touched her "private part."

At the conclusion of all of the evidence, appellant moved to strike the evidence, pointing out the inconsistencies in the girls' testimony. He also argued that appellant was asleep when his hand was placed on the girls' breasts and genitals. The trial court denied the motion.

## ANALYSIS

Appellant contends that the testimony of C.H., A.H., and K.A. are unworthy of belief and the trial court erred in not striking the Commonwealth's evidence. His entire argument

challenges the credibility of the young girls.[1]  Appellant concedes that if believable, the girls'

testimony would be sufficient to convict.[2]

Thus, the inquiry before this Court is to determine whether the testimony of C.H., A.H.,

and K.A. is, as a matter of law, inherently incredible.  Appellant points to the inconsistencies in

their testimony at trial, at the preliminary hearing and their earlier accounts of the incident to the

principal and the New Jersey police.

> When faced with a challenge to the sufficiency of the evidence, we "presume the judgment of the trial court to be correct" and reverse only if the trial court's decision is "plainly wrong or without evidence" to support it.  Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*) (citations omitted); see also McGee v. Commonwealth, 25 Va. App. 193, 197-98, 487 S.E.2d 259, 261 (1997) (*en banc*)).
>
> \*    \*    \*    \*    \*    \*    \*
>
> Put another way, a reviewing court does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (emphasis in original and citation omitted).  We must instead ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Kelly, 41 Va. App. at 257, 584 S.E.2d at 447 (quoting Jackson, 443 U.S. at 319 (emphasis in original)); see also Hoambrecker v. City of Lynchburg, 13 Va. App. 511, 514, 412 S.E.2d 729, 731 (1992) (observing that the question on appeal is whether "a rational trier of fact could have found the essential elements" of the convicted offense).  "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

---

[1] The Attorney General argues this issue is defaulted under Rule 5A:18 because appellant, in his motions to strike, did not argue the victims' testimony was inherently incredible.  We disagree.  Appellant did argue that the girls' testimony was incredible, specifically pointing to the inconsistencies in the evidence and arguing that there was no "credible evidence" presented against appellant.  The trial court was afforded an opportunity to intelligently rule on the issue; therefore, it was preserved for appeal.  See Campbell v. Commonwealth, 12 Va. App. 476, 480-81, 405 S.E.2d 1, 2-3 (1991) (*en banc*).

[2] On brief, appellant claims he did not touch the breasts of the victims because the prepubescent girls had no breasts.  At oral argument appellant conceded that this issue was not raised at trial and is barred by Rule 5A:18.

inferences from basic facts to ultimate facts." Kelly, 41 Va. App. at 257-58, 584 S.E.2d at 447 (quoting Jackson, 443 U.S. at 319).

Crowder v. Commonwealth, 41 Va. App. 658, 662-63, 588 S.E.2d 384, 386-87 (2003).

Appellant's argument rests solely upon the credibility of the young victims, emphasizing their inconsistent statements. Yet, it is within the province of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts presented. Long v. Commonwealth, 8 Va. App. 194, 199, 379 S.E.2d 473, 476 (1989). Witness credibility determinations shall only be disturbed on appeal if the testimony is "inherently incredible, or so contrary to human experience as to render it unworthy of belief." Fisher v. Commonwealth, 228 Va. 296, 299-300, 321 S.E.2d 202, 204 (1984).

> The fact that a witness makes inconsistent statements in regard to the subject matter under investigation does not render his testimony nugatory or unworthy of belief. It is the province of the trier of the facts - jury or judge - "to pass upon such inconsistent statements and give or withhold their assent to the truthfulness of the particular statement." It is firmly imbedded in the law of Virginia that the credibility of a witness who makes inconsistent statements on the stand is a question for the jury, or for the trial court as a trier of the facts sitting without a jury.

Swanson v. Commonwealth, 8 Va. App. 376, 378-79, 382 S.E.2d 258, 259 (1989) (quoting Shelton v. Mullins, 207 Va. 17, 22, 147 S.E.2d 754, 758 (1966)).

Thus, we must affirm the convictions unless we find as a matter of law, that their testimony is "impossible, manifestly untrue, unworthy of belief, contrary to physical facts, common observation and experience, and inherently incredible." Simpson v. Commonwealth, 199 Va. 549, 558, 100 S.E.2d 701, 707 (1957) (citing Kirby v. Moehlman, 182 Va. 876, 883, 30 S.E.2d 548, 550 (1944)).

In Burke v. Scott, 192 Va. 16, 23, 63 S.E.2d 740, 744 (1951), the Supreme Court said: "To be incredible, evidence must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of

which reasonable men should not differ." See also Clayton v. Taylor, 193 Va. 555, 560, 69 S.E.2d 424, 428 (1952); Anchor Motor Freight, Inc. v. Paul, 198 Va. 480, 486, 95 S.E.2d 179, 184 (1956).

Both C.H. and K.A. testified appellant fondled their breasts and vagina. Each of the girls was under 12 years of age when they testified. The jury heard their testimony and observed their demeanor. Appellant brought to the jury's attention, through cross-examination, exhibits and closing argument, the inconsistencies in their version of the events. The jury heard appellant's testimony and the testimony of his witnesses. They rejected that testimony.

Further, appellant corroborated aspects of the girls' testimony. Appellant admitted he had been drinking, that he told the girls to come into his bedroom, that he was watching television, and that they were all on the bed. Appellant also accepted M.L.'s testimony that the girls manipulated his hand so as to fondle C.H. and K.A.

The jury could very well have concluded that because of the girls' age, immaturity and susceptibility to leading questions, that the inconsistencies did not undermine their credibility. See generally Montague v. Commonwealth, 40 Va. App. 430, 436, 579 S.E.2d 667, 669 (2003) (noting that a fact finder need not decide between rejecting or accepting a witness' testimony in full, but may find it credible in part and incredible in part).

In Parsons v. Parker, 160 Va. 810, 821, 170 S.E. 1, 4 (1933) (quoting Equitable Life Assur. Soc. v. Kitts, 109 Va. 105, 106-07, 63 S.E. 455, 456 (1909)), it is stated:

> "When the law says that it is for the jury to judge of the credibility of a witness, it is not a matter of degree. So long as a witness deposes to facts which, if true, are sufficient to maintain their verdict, then the fact that his credit is impeached by an attack upon his character, by contradictory statements - especially when it is sought to contradict his testimony by conflicting statements made out of court - affects only his credibility, and goes not to his competency but to the weight and sufficiency of his testimony. If the jury, in their discretion, see fit to base their verdict upon his

testimony, and the trial court refuses to disturb that verdict there can be no relief in an appellate court."

## CONCLUSION

The jury resolved the conflicts in testimony against appellant. We cannot say, as a matter of law, the jury was wrong.

We affirm the convictions.

Affirmed.

Benton, J., dissenting.

The Commonwealth indicted Bobby S. Hawkins on four charges of aggravated sexual battery, which were alleged to have occurred when four girls, ages 8, 9, 10, and 10, were together in a room with Hawkins. The jury acquitted Hawkins of the charges involving two of the girls and convicted him of the charges involving two girls. I would hold that the evidence on which these two convictions was based was the inherently incredible testimony of two girls, one of whom was described by one of the other girls as a girl who "says and does nasty things."

I.

The evidence proved that at the end of June 2002 three girls, C.H., her sister A.H., and K.A. had an overnight "sleepover" with their friend, M.L., in her apartment. All the girls lived with their families in the same apartment building. Also present in the apartment were Hawkins, who is the stepfather of M.L., Hawkins's wife, and Hawkins's wife's adult daughter. Late that night, the girls went into Hawkins's bedroom to watch television. Hawkins's wife and her adult daughter were in the living room.

Almost three months later, the principal of the elementary school learned that a student had made statements to other students about a teacher in the school. The student was K.A.; the teacher was Hawkins, who has no prior record of felonies or sex offenses. The principal and her assistant principal had a conference with K.A., who has learning disabilities. The principal testified that K.A. gave her two versions of events.

> [K.A.] went on to say that they had been -- they spent the night and were watching T.V., [M.L.], two other friends and herself, four girls, and Mr. Hawkins came to the room and told them to come into the master bedroom with him, and they went, and they sat on the left corner of the bed.
>
> Then she said he came to the door, and he had no pajama bottoms on and told them to come to the bedroom, and he got in the bed. They sat on the left corner of the bed, and then she fell

- 9 -

asleep. When she woke up she felt him feeling her breasts. That was her first story.

The principal and the assistant principal also talked to M.L., who was a student at the same school, and resumed their interview with K.A.. The principal testified that K.A. then gave a second version of these events.

> [K.A.] did say, "I didn't know he had his clothes on. He did have his pajamas on." She said that. That was a statement she made. Another statement she made was that, "We were making noise in the room. We were bumping into the rooms. The lights were out. We were playing hide-and-seek, and we were basically being disruptive. That's why he did tell us to come to the other room to separate us from the boys that were in the room. There was lots of kids in the room, and he separated the girls from the boys."

> Then another thing that she said was that Mr. Hawkins had fallen asleep while they were still watching T.V., the girls, and that she agreed to the fact that one of the girls, [C.H.], had taken Mr. Hawkins' hand while he was asleep, he was in a very deep sleep, and had taken his hand and rubbed it in her genital area and told [K.A.], and [K.A.] said she told her, "You do the same thing," and [K.A.] said, "I wouldn't do it," and so [C.H.] took his hand and did it to [K.A.] herself, and that was pretty much the end of the story.

> \*     \*     \*     \*     \*     \*     \*

> [K.A.] said he got on top of her and was moving up and down. At one point she said she was on her stomach, and one time he was, but she did say he got on top of her, did an up and down motion, and my mental picture is that she is laying face down.

> Q. Did she tell you how many girls he did that to?

> A. All four.

The assistant principal of the school similarly recounted K.A.'s statements as follows:

> [K.A.] stated that she and two other girls her age were spending the night at [M.L.'s] house when Mr. Hawkins came to the door where the girls were watching T.V. in [M.L.'s] bedroom and told them to go to his bedroom to watch T.V. She said he had on a pajama top but no bottoms. When they got to the bedroom the girls sat on the corner of the bed and watched T.V.

- 10 -

Mr. Hawkins got in the right side of the bed under the cover with no clothes on. During the night [K.A.] said she was awakened by the feel of Mr. Hawkins rubbing her breast, said she went back to sleep, and at some later time during the night she was awakened by Mr. Hawkins turning her over on her stomach, face down.

She said he then got on top of her and began moving in an up and down motion. Afterwards he got on top of each girl beginning with [M.L.] and [A.H.] and, lastly, [C.H.]. [M.L.'s] mother stayed in the living room, and the oldest daughter later came in the bedroom and told all the girls to go back to [M.L.'s] bedroom.

The assistant principal also testified that [K.A.] changed her story and gave a second version as follows:

They were talking about [C.H.], and one of the girls made a statement that she says and does nasty things and that [C.H.] had taken Mr. Hawkins' hand while he was asleep on his back and moved it in a circular and up and down motion around her private parts. She said that [C.H.] said that it felt good and said, "[K.A.], you do it," and [K.A.] went ahead and let [C.H.] take Mr. Hawkins' hand and do it do her.

Q. Did she say anything else at that -- or during that conversation?

A. She said again at that point -- [K.A.] stated that while she was asleep, meaning [M.L.], that Mr. Hawkins rolled her over on her stomach, face down, got on top of her and started moving. She said that she fell back asleep until [M.L.'s] mother came back in the room and told them to go back into [M.L.'s] bedroom.

At trial, K.A. acknowledged that she talked to the principal and assistant principal after her "friend told the teacher." Although she testified at trial that Hawkins wore "boxers and a T-shirt," she admitting telling her principal that Hawkins wore pajamas without pants. She denied telling them that Hawkins rolled her onto her stomach, denied saying Hawkins was on top of her and the other girls, and denied telling them that she and C.H. put Hawkins's hand inside their underwear. She also denied telling her principals that Hawkins was asleep.

Instead, K.A. testified the girls were making noise in M.L.'s room when Hawkins told them to come to his room. Hawkins put his hands all over her while she was on the bed. She

- 11 -

said he touched her breasts and her privates under her clothing. She testified she did not say anything because she "didn't want [Hawkins] to know [she] was awake." K.A. testified she was "wake--sleeping." She also testified that Hawkins was asleep and that she "guess he had woke up" when he touched her. However, she testified that she did not see his face.

K.A. testified that after Hawkins touched her, Hawkins next touched A.H., who then went to sleep. K.A. testified that she was "right beside [Hawkins] and then he just switched or something like that" and next touched C.H. She testified that M.L. was asleep. On cross-examination, K.A. said she was sleeping when these events occurred. She also said Hawkins was asleep at some point and she "guess[ed] he had woke up." K.A. also testified that Hawkins did not touch M.L.

The record contains the transcript of an interview conducted by a police officer with C.H. seven months after the sleepover. During the interview, C.H. identified parts of the body, including "nipples," "legs," "belly button," and "private parts." She told the detective Hawkins touched her "chest" and her "thigh." She said he did not touch her any other place when he touched her "thigh." When asked "did he touch you on top of your clothes or under your clothes," C.H. said he only touched "on top of [her] clothes." In describing these events, she said:

> Q. Okay. Did he touch anywhere else when he touched your thigh?
>
> A. Um um (negative response).
>
> Q. Okay. So he touched your chest.
>
> A. Um hm (affirmative response).
>
> Q. Okay. How long did that last?
>
> A. For a little bit.

Q. Okay. When you say he touched it, what's a touch? Did he just go like this or did he do anything else?

A. He just went like this.

Q. Okay. You say, you showed that he move . . . , did he move his hand?

A. (No verbal response.)

Later, during the interview, the police officer again specifically asked C.H. "is there any time that he touched your private part?" She responded, "Um-um (negative response)."

C.H. testified at trial and gave yet another version of events. She said the girls were playing in M.L.'s room and then went into Hawkins's room at M.L.'s invitation, contradicting K.A.'s testimony that Hawkins came for them. According to her, Hawkins was on the bed watching television and drinking alcoholic beverages. She testified that shortly after they entered the room and while the girls and Hawkins lay on the bed, Hawkins began to touch the clothes covering K.A.'s breast and vagina and then went under the clothes covering K.A.'s vagina. She testified that Hawkins's eyes were "halfway open and closed" and that he looked as if he was asleep. She also testified she never saw his eyes.

She testified that K.A. then moved and that M.L. moved in front of Hawkins. She said "they took turns" and "[M.L.] moved over." According to C.H., Hawkins then touched M.L. where the clothes covered her breasts. Her testimony directly contradicts K.A., who testified Hawkins never touched M.L. and that Hawkins touched A.H. after Hawkins touched K.A. C.H. testified that she did not know whether Hawkins's eyes were open or closed.

C.H. testified that Hawkins then moved, causing M.L. to be "up under him," and that he moved next to her (C.H.). She testified that his hands went under her clothes and touched her breast. Contrary to her earlier statement to the detectives, C.H. testified that Hawkins touched the clothes over her vagina. C.H. testified the touching lasted "for a little bit." C.H. testified that

- 13 -

Hawkins never spoke, that none of the girls spoke, that she could not see his face, and that she did not know whether his eyes were open or closed. She saw Hawkins do nothing else, and she testified that her sister, A.H., was "halfway asleep."

According to C.H., the girls then returned to M.L.'s room because "they all wanted to go back to sleep." She testified that Hawkins looked as if he was asleep, that his eyes were closed, and that the girls moved toward Hawkins because they wanted to move around. At the preliminary hearing, C.H. testified affirmatively when asked "Is it possible . . . Hawkins was all the way asleep when this happened."

A.H. testified that they played in M.L.'s room and then went to Hawkins's room. She testified Hawkins was "halfway sleep" on the bed. She was on the floor next to the bed while the other girls "were on a bed playing." She testified Hawkins touched K.A. first in her genitalia and breasts. She said neither K.A. nor Hawkins spoke. She testified that K.A. moved and then Hawkins touched her sister C.H. in the same places. This testimony conflicts with K.A.'s testimony that A.H. was the second person Hawkins touched and conflicts with C.H.'s testimony that M.L. was the second person Hawkins touched. A.H. testified that Hawkins touched no one else, but she contradicted this testimony, saying Hawkins "was touching [her] in places where he's not supposed to be." The prosecutor did not question A.H. to have her explain where she was touched. On cross-examination, however, A.H. testified that she was asleep the entire time and that her sister, C.H., told her that Hawkins touched K.A. She acknowledged that when she earlier testified at the preliminary hearing, she said she did not see anything happen to the girls and she said they told her it happened. On redirect, she testified she saw Hawkins touch K.A. but she did not see Hawkins touch her sister, C.H. She said she testified Hawkins touched C.H. "because [K.A.] and [C.H.] told [her]" it happened.

- 14 -

II.

The Supreme Court has "repeatedly said that it is not sufficient to warrant a verdict of guilty beyond a reasonable doubt if the evidence is inherently incredible, or so contrary to human experience or to usual human behavior as to render it unworthy of belief." Willis & Bell v. Commonwealth, 218 Va. 560, 563, 238 S.E.2d 811, 812-13 (1977). I would hold that the trial testimony of C.H., and K.A., was so implausible as to be inherently incredible. They contradicted each other at trial and gave trial testimony that contradicted in material respects the statements they made to investigators before trial.

This was not a case where there were merely minor inconsistencies in the girls' testimony. Rather, these were the kinds of material and unusual conflicts in K.A.'s and C.H.'s testimony that rendered their versions of the events incredible as a matter of law. The only corroborated version of what occurred that night was the version K.A. told the school principals, that is, while Hawkins was asleep, C.H. had taken his hand and rubbed her genitals and then used his hand to rub K.A.'s genitals. Both K.A. and C.H. testified they had not discussed with M.L. what occurred that night, yet M.L. testified at trial that C.H. had manipulated Hawkins's hand while he slept.

C.H. told the police investigators that Hawkins never touched her genitalia, but yet she testified at trial that he did. She testified at preliminary hearing that it was possible Hawkins was asleep when these events were alleged to have occurred. At trial, however, she testified she could not remember anything she said under oath at the preliminary hearing.

Likewise, three months after these events were alleged to have occurred, K.A. told her principals two versions of events that clearly demonstrate she had concocted a fantasy to blame Hawkins for C.H.'s bad conduct. For example, K.A. first told her school principals that she was awakened when Hawkins began rubbing her breast. She then told the principals that C.H. took

Hawkins's hand while he was asleep, then C.H. rubbed her genitals with his hand. Her story changed again when she told the principals that Hawkins climbed on top of his stepdaughter M.L. and other girls and started "moving." As the prosecutor informed the jury "she has some disabilities . . . she sounds different and has issues the other children don't have."

As the jury recognized when it acquitted Hawkins of the charges against A.H. and M.L., C.H.'s and K.A.'s stories were not credible because they contradicted each other. In direct contradiction to K.A.'s and A.H.'s stories, C.H. testified that Hawkins did not get on top of the other girls and move up and down. In addition, A.H.'s testimony clearly demonstrates that the girls' stories were malleable and obviously concocted. A.H., who is C.H.'s younger sister, first told the detective that Hawkins did not touch K.A.'s breast, but that he had touched C.H.'s breast. At trial, on direct examination, she testified that Hawkins touched K.A.'s breast and that he then touched C.H. On cross-examination, she testified that she never saw Hawkins touch K.A. Indeed, at the preliminary hearing, she admitted that she had not seen Hawkins touch any of the girls because she was asleep the entire time. She also admitted at trial that she did not see Hawkins touch her sister C.H. and that she only said it occurred because K.A. and C.H. "told her."

Significantly, the jury found unbelievable aspects of C.H.'s and K.A.'s testimony. Although C.H. testified that Hawkins fondled M.L., and K.A. testified that Hawkins fondled A.H., the jury acquitted Hawkins of both those charges. Indeed, M.L., who is Hawkins's stepdaughter, testified as follows:

> Q. Can you tell us what you saw with your own eyes when you were in that room?
>
> A. When I was lying down next to Mr. Bobby Hawkins watching T.V., he fell asleep. [C.H.] moved me out of the way and went to go lay beside him and put her hand in her private parts.
>
> Q. Her own hand?

A. No, his hand.

Q. Mr. Hawkins is your stepfather?

A. Yes.

Q. You were laying next to him initially?

A. Yes.

Q. And which young lady came and moved you out of the way?

A. [C.H.]

Q. What did she do when she got next to your stepfather?

A. She took his hand and put it on her private part.

Q. What was Mr. Hawkins doing at that time?

A. Sleeping.

Q. How did you know he was asleep?

A. Because he snores when he sleeps.

Q. And what happened after [C.H.] did that?

A. Then she moved [K.A.] over there and put his hand on her private part.

Q. You saw both of them do that?

A. Yes.

Q. Was he still asleep when [K.A.] did that?

A. Yes.

Q. What else did you see?

A. Then [C.H.] tried to move me over there and put his hand on my private part, and I said, "No, I'm not doing that."

I would hold the evidence in this case from K.A., C.H., and A.H. was so contradictory and internally inconsistent that it was inherently incredible. I would, therefore, reverse the convictions.